The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you. Please be seated. Good morning and welcome to the Fourth Circuit. Judge Floyd, Judge Harris, and I are very pleased to be hearing the arguments in the cases today. In our first case is Brenda Butler v. Drive Automotive. Are the parties ready? Mr. Dunleavy. Thank you, Judge Keenan. Good morning and may it please the Court. This is a Title VII employment case. My client, the appellant Deborah Butler, worked for Drive Automotive through a staffing agency called Resource MFG. Ms. Butler claims she was sexually harassed and fired in retaliation for complaining about the sexual harassment. The main issue on this appeal is whether Ms. Butler can be considered jointly employed by both the staffing company and Drive Automotive. The magistrate judge concluded as a matter of law that she could not, and that was the sole basis for the summary judgment in this case. Now, Drive argues alternative grounds and specifically that on the merits of each of the three Title VII claims that it's entitled to judgment as a matter of law. But I'll turn first to the joint employer question. Excuse me. In our view, the first mistake that the magistrate judge made was concluding that this was a pure question of law. And the Court cited the Silocek versus Inova Health System case for that point. But a review of the Silocek case, and excuse my pronunciation if it's wrong on that, but a review of that case indicates that the facts were not in dispute there. We would argue that a case cited by both parties, Magnuson versus Peak Technical Services, has a good illustration of how this joint employer analysis ought to work at the district court level. Mr. Dunleavy, Silocek was a case in which the Court was asked to make a determination whether the physician, I believe, was an independent contractor or was an employee. Isn't that correct? Yes, Your Honor. Do I have the right case? Yes. Could you explain for us how that analysis differs from the analysis that needed to be employed in this case? Certainly. Because it seems to me that that has to be a distinction. So if you could tell us if that's a distinction with a difference, and if so, what kind of difference? Right. Your Honor, it is an important difference. In the independent contractor analysis, a lot of it concerns the extent to which the employee has his own tools of work and has an opportunity for profit and loss arising from the engagement, as opposed to being economically dependent on the employer. We believe the issue in this context, in the joint employer context, is one of common control. It's not a binary choice. It's not an either-or proposition. It's if you have more than one putative employer, do they share control? And to use the language of the cases, do the putative employers share or co-determine those matters governing the material terms and conditions of employment? So we feel that you look to the factors that have arisen in the cases, the policies and training, who makes the hiring and assignment decisions, the day-to-day supervision, which party or do both control discipline and termination, and which party controls the end of the  And on all of these factors, Your Honor, the underlying goal is not to focus on the labels that the parties impose or the formalities of the relationship, but rather the reality of it. Just so I understand, is your argument that on those factors, there are disputed facts that need to go to a jury? Or is your argument that as a matter of law, drive is the employer? It should go to the jury, Your Honor. We're just arguing it shouldn't have been resolved in favor of drive. And what are the disputed issues that the jury will resolve? Well, more than disputes of fact, it's the inferences that are drawn from the facts. There are witnesses, for instance, who say that Resource had a supervisor on site, but then there's a lot of other witness testimony that says that the actual supervision on the line was done by the team leader. Right. So what's the jury supposed to do? Is the jury supposed to figure out what the proper legal inference is from the undisputed facts? Right. Which is the more important factor? Why is that a jury question? Well, Your Honor, part of it comes down to determining which of the witnesses had a better understanding of what the actual day-to-day... Okay. So there's a fact question at the bottom of this. It's not just about the legal significance of the facts. Both. Yes, both, Your Honor. And again, I would, again, hold up the Magnuson case as a good illustration of the district court looking at these factors, looking at when there may be inferences going either way and leaving it for the jury's determination. Well, assume for the moment that we formally adopt a joint employment doctrine for the circuit, what test would you use? I see the other side. One of them argues it should be an individual control test, and the other one economic realities. How about a hybrid test? Yes, Your Honor. I think the hybrid might be the best characterization of it, and I would concede that although we've argued the economic realities are important to the consideration, not all of the cases use the term economic realities. But, Your Honor, again, what the bottom line is to evaluate the extent to which there's common control, not to view it as an either-or, but to look, do the parties share control? And to look at that, the factors ought to be control over assignments, control over day-to-day supervision, policies and training, and which party controls the ending of the assignment or termination. And in this particular case, Your Honors, I would submit that it really doesn't matter which test it is, that there's a good deal of evidence suggesting that drive automotive was pulling the strings, regardless of what the formalities were of . . . Drive automotive, is it undisputed or not that drive automotive was directing the performance of the work in this case? We believe it's very clear that drive automotive was . . . Yeah, but I'm saying, is there any evidence on the other side that they were not directing how this work was done at the BMW plant? Not on a day-to-day basis, no, Your Honor. Turning to the specifics of that test I just described in response to Judge Floyd's question, as to hiring an assignment, the evidence is that resource had no authority to deny the assignment requests that drive made. And specifically with respect to Ms. Butler, the evidence is that the drive supervisor, Lisa Thomas, requested that Ms. Butler be put on her team the following Monday she was. Okay, what exactly did Ms. Butler do? She worked with doors or . . . Right, she worked manufacturing automotive parts that would go into a vehicle. The parts, okay. Is there any evidence in this record that resource in any way controlled the method of operation? I'm not talking about telling her where to park and issuing her paycheck and those administrative functions, but is there any evidence in this record that resource controlled how she performed her job on the line? No, there is not. Okay. And just to get to that point, the resource supervisor, there's a lot of emphasis in the decision of the court below and in Drive's briefing about the resource, there being a resource supervisor on site. But just to be clear about that, the resource supervisor described his role as being available as needed. He was not on the floor. He was not supervising on the line. Telling them how to build the product. Right. Okay, then why are you saying that this is a jury question? Well, Your Honor, we'll take what we can get. You know, the posture . . . I mean, based on the record that you're saying is in front of us. Right. I'm struggling a little bit with why this is a jury question from your perspective. I'm sure they have, you know, the other side may have a very different perspective on the record, but . . . Right. I mean, we certainly think a court could determine as a matter of law that the facts are clear enough that Drive should be considered a joint employer. I'm simply responding to the posture of the case. We didn't move for summary judgment. They did. But I certainly agree with the court that there are, you know, all the key factors support joint employment in this circumstance. I'm not saying that they do. I'm saying that you're saying they do. Yes. Yes, Your Honor. Yes, Your Honor. We would certainly argue in the alternative our position is that the important factors all weigh in favor of Drive being recognized as a joint employer. Your Honor, in addition to the evidence that the resource supervisor played no role in the day-to-day supervision, I want to point out with respect to the actual events in this case. Ms. Butler did report the harassment to her resource management, but she also reported it to three separate Drive supervisors, to Ms. Thomas, to Ms. Thomas' supervisor, Mr. Winkle, and to an employee liaison, an ombudsman who worked for Drive. So the idea that the resource supervisor was some sort of one-stop solution isn't borne out by the facts. Can I ask you about resource? So resource is not in this case, right? Resource was an originally named defendant, settled, and is no longer in the case. Okay. And was it sort of . . . that's all I need to know. Thank you. Okay. With respect to discipline and termination, Drive has argued that, excuse me, that the discipline was formally undertaken by resource. Resource would be the one to communicate the discipline to Ms. Butler. But, Your Honor, the record establishes that Drive was the decision-maker. Ms. Thomas was the one who concluded that the termination, that the assignment should end. And . . . Is there anything in the record suggesting any sort of independent decision made by resource? No. No, Your Honor. With respect to all of the decisions that I've discussed, it was Drive making the decision, communicating it to resource, and resource implementing it. Okay. But there was never any back and forth. There was no testimony that, oh, resource was about to get rid of her anyway, before they heard from Drive. There's nothing in the record like that. No, no, no. Certainly not, Your Honor. Now, what they've argued is that Ms. Thomas wanted . . . That Drive wanted her out for different reasons. Right. I understand. But there's nothing in the record saying that, quite apart from anything that was going on at Drive, resource was about to sort of cut back on its ranks of temporary employees. Nothing like that. No. No, Your Honor. No, Your Honor. The evidence is that there is some evidence that Ms. Thomas wanted to terminate the assignment earlier than it was actually ended. But the testimony on that was that Ms. Thomas ultimately agreed to postpone the decision because of the holidays and the short staffing. So, it was not something that resource imposed on Drive. Your Honor, briefly in my remaining time, as to the alternative arguments on the merits, we believe, in light of the Court's recent Walker v. Modigrath-Holmes case, that the evidence on hostile environment harassment is sufficient to send to a jury. The Court emphasized in that case that the severe and pervasive standard is quintessentially a jury question. And, Your Honor, here we have, in a period of two months, we have seven or eight offensive comments at least. We have a very disturbing physical touching having taken place in which the supervisor um, stood behind Ms. Butler and ground his genitalia into her. And we have, at the end of the assignment, Mr. Green calling Ms. Butler and offering to reverse the end of the assignment if she would do what he wanted. The district court didn't address that. The district court did not address any of those arguments. No, Your Honor. And, with respect to the pro quo claim, Driver's argued in a footnote that Mr. Green was not a supervisor. The evidence is that he was given substantial control. Again, this was not decided by the district court. No, it was not. No, it was not. And likewise, the retaliation claims were not addressed by the district court. We have, in our briefs, indicated that we believe there are clear issues of fact on that. There's a dispute as to when, excuse me, when the Drive supervisor wanted the assignment to end, but the documentation, as opposed to what she now says, the documentation of her desire to end the assignment did not take place until after Ms. Butler's complaints. Can I ask you a question? It's purely hypothetical, I guess, but I'm wondering on the termination decision, if the temporary agency for termination decision, I mean, is that going to be a viable claim or is the temporary agency going to say, it wasn't our decision, somebody else decided it? In this kind of joint employer situation, does the termination claim go to both employers or is that one really only viable as against the client agency, the one who made the decision to terminate? Yeah, I think the better rule would be that the decision-making entity would, for the same reason they'd be deemed to exercise control, would be responsible for the decision. So if someone like Ms. Butler can't sue the client agency for that, there's really no one to sue? Yes, Your Honor, I believe that's correct and I see I'm out of time. Thank you. All right, sir, thank you. Ms. Lewis? May it please the Court, my name is Stephanie Lewis on behalf of the respondent Drive Automotive. I want to first address the test that should be applied in this case. The law is settled that the test to be applied in a Title VII case to determine an employer relationship is that of the master-servant doctrine as understood by the common law of agency. That was decided by this Court in SILSEC in a Title VII case in an opinion written by Judge Niemeyer and joined by Judge Motz. And that was confirmed, the reasoning was confirmed again by the Supreme Court in Clackamas in which the Court dealt not just with an independent contractor relationship but with an argument about partners and whether they were employees under the ADA. And in Clackamas, the Court said, once again, we resolve the question of employer relationships under the statutes where employee is not defined in anything other than a circular way. And the language in the ADA on this point is identical to Title VII. We resolve that question by looking to the master-servant doctrine and the common law of agency. That analysis is wholly applicable here. There is no basis to distinguish in a joint employer or a multiple employer context. What the Supreme Court said is, and it rejected the lower court's use of economic realities, and the Supreme Court said that the common law in this area uses control as the touchstone or the guidepost to determine employer status. The Fourth Circuit, taking Clackamas, has always applied the same factors that Clackamas applied. Clackamas used Darden, which was an ERISA case where, again, employee was not defined in anything other than a circular way, as it is with Title VII. And Clackamas said the Darden factors apply. The Darden factors are the same factors that this Court used in Silisec. I just want to make sure I'm not missing anything. There aren't any Fourth Circuit cases on facts like these, right, where no one is contesting that the person is an employee. No one's talking about sort of independent profit-making opportunities or anything like that. Everybody agrees the person is an employee, and the only question is whether there's one employer or two. We don't have any Fourth Circuit case law on that, do we? So the question is, is drive an employer for purposes of Title VII? And that question is governed by the Clackamas inquiry. And I understand that that's your argument, but I'm just asking a question about the state of law in the Fourth Circuit. There's nothing on point in the Fourth Circuit. It is true that the Fourth Circuit has never adopted the joint employer test or spoken to whether joint employment is a possibility in the Title VII context at all. And the Supreme Court actually hasn't spoken to the joint employer test in Title VII cases either. But if you look at the analysis in Clackamas, I don't think there's any way to analytically reach a different result in terms of what test is to be applied, because Clackamas dealt with a question of whether a partner should be an employee. And Clackamas said Darden was an independent contractor case, but it doesn't matter. It doesn't matter if it's an independent contractor case, to Judge Keenan's point, or if it is a multiple employer case. Title VII speaks to whether you're an employer and an employee. And Drive's argument is that we are not an employer. Title VII doesn't contain any reference to joint employment at all. I definitely don't want to stick you on this point in your argument for too long. But in both the partner case and the independent contractor cases, the question is, is this person an employee or not, whether or not is independent contractor or partner? That's not the question in this case. Everybody agrees, I believe, I should ask. Everyone is conceding that Ms. Butler is an employee. We do not concede she is our employee. And go ahead, sorry. She's an employee. She's not. She is neither a partner nor an independent contractor. Maybe not of you. I mean, are you not conceding that Resource is an employer of Ms. Butler? Resource was an employer of Ms. Butler. She is an employee out in the world. And the only question is, does she have more than one employer? But the reason that the statutory analysis doesn't change is because the statute is set up to say that only employers have liability to their employees. That's interesting. The EEOC disagrees with you on that, right? The EEOC does disagree in their guidance, but the EEOC guidance is not persuasive on that point. The Fourth Circuit has specifically held in Garrett, which is an ADEA case with the exact same language that is in Title VII, same operative language. The Fourth Circuit said individual means employee in that language. So the Fourth Circuit law is settled that this statute only deals with employees of the employer, of the employer. And so while she's an employee of someone else, the employment relationship with DRIVE is the critical inquiry in determining whether DRIVE has any liability under Title VII. Although, you know, Garrett, you were just citing Garrett, but Garrett specifically says control is the most important factor to be considered. Which is what the Supreme Court says. Right. Control is the test. There's no question control is the test. The parties are in agreement. Well, they use language around economic realities, and they use language around other district court decisions about how they've applied the test. The test is in Clackamas, Darden, and Sillisac. And Garrett, actually, Sillisac, you'll read, uses a CF site to Garrett, because the Garrett test is called a hybrid test, and Clackamas doesn't adopt a hybrid test. So Clackamas is the governing law on the test of control. And Clackamas says control is the guidepost for this. Right. Now, walk us through, then, from your perspective, why there wasn't control by DRIVE. Sure. So one of your questions was, did DRIVE, or resource, or both, or neither, control the method by which Butler performed her assignments? The creation of the work product. Yes, yes, yes. So the method and the means of producing the work, control of the work. So the testimony on this is undisputed. Both Ms. Butler and Mr. Roberson, who was the on-site supervisor of resource placed at DRIVE, both of them testified that Mr. Roberson would make the schedule in terms of where people would go, and that Mr. Roberson was responsible for communicating with Ms. Butler about her performance. Right. That's administrative oversight, isn't it? What we're talking about is who was responsible for how this product was manufactured, and who provided oversight as to how this product was manufactured in terms of that employee's assigned duties in producing that product. And it seems to me, it's going to be very, very hard for you to say that DRIVE did not have control over that part of the operation. So Ms. Butler actually testified that nobody was on the line beside her in terms of supervision of her activities on the line. Her testimony was that nobody was. Right. But somebody controlled how this product was produced. The quality standard, sure. Right. Now DRIVE . . . That's not a sure. That's pretty big, isn't it? It's not big, because if you look at the Silasek case where the issue again was whether he was an employee, there were very stringent rules in Silasek about how he did his job as a physician in the emergency room. If you look at the other cases involving temporary staffing companies, like in the Third Circuit with the UPS case, obviously the client is going to have its own rules about . . . But the Silasek was the independent contractor. But again, this test is the same. The Silasek test used the Darden factors. Clackamas confirmed those are the correct factors to be used. So the test is the same. And so what the court said in Silasek is, yes, the doctor was governed by the rules of the hospital in certain respects in terms of quality of patient care, which is equivalent in the manufacturing setting to quality of products. You can't really be suggesting, right, that Ms. Butler had the same kind of professional autonomy as a doctor working in a hospital, which the court really relied on in that case in Silasek. Doctors are different. They have to have the autonomy to make these care decisions. You're not suggesting Ms. Butler had the same kind of professional autonomy on the line at drive as a doctor in a hospital, are you? I'm not suggesting that. But what I am saying is that each of these cases, looking at the level of control, takes into account the industry in which the individual works. And in the manufacturing industry, the client is going to govern the quality of the product that's produced. So a rule you would be adopting as a court is that in the manufacturing industry, you can never not be the employer because you have quality standards. So the idea is that each case looking at that looks at the specific industry at issue, and the rule that would be adopted if this court were to simply say that drive sets quality standards, and therefore they are the employer, that rule would effectively say— What the product was going to be. And resource didn't have anything to do with that. They were administrators of these temporary employees, weren't they? No, no, Your Honor. So actually, drive doesn't actually set the standards of— Well, I guess BMW does. Right, right. So you can't make— But drive implements the standards and oversees them, doesn't it? So drive implements the standards set by other entities, BMW and others. That is typical of the manufacturing industry. But what they did is they put into place a system where the control over the supervision of the temporary employees remained with resource. They had on-site supervision. The testimony is undisputed. Ms. Butler and Mr. Roberson say that all of Ms. Butler and the other temporary employees knew to report problems to resource. That is a part of controlling the method of the operation of the business. Isn't one of your arguments that Ms. Butler was terminated because she failed to follow instructions given to her by drive employees and because she sort of demonstrated to drive managers, team leaders, quasi-supervisors—I'm trying not to—not a charge label, but the people to whom she reported—that she had a bad attitude and was sassy? I mean, it sure sounds like they're kind of in the trenches telling her what to do and monitoring her responses. The testimony is undisputed that what drive does is it tells the temporary employees, the contract employees, what line to work on or what machine to work on, so not what to do. Well, what else is there? Is there someone else telling them which lever to pull when they get there? Is that where Mr. Roberson comes in and gets right next to them on the line and says, push that button? Nobody gets right next to them on the line. Drive doesn't and resource doesn't. I think they're undirected. You're just pointed in a direction and figure out the job for yourself at the point. Resource assigns the job based on a requisition process, and this is in Roberson's testimony. Drive tells resource where they need people and how many people they need in the plant. Resource assigns its own employee, controls those decisions about who to send where. Once they get to the actual work location based on the requisition, then drive says work in this cell or work on this machine. Resource has already provided some safety training, and then if drive needs to provide additional training about how to pull the lever, Roberson's testimony is that resource is present for that training as well. It's present, but does it direct that training? It's already directed its own safety training, and the second part of the training on how to use the equipment is conducted by drive. And that's true in every manufacturing setting, that the client, the manufacturer using their own forklifts and their own equipment is going to have to show people how to use the equipment. Really, that is the only control that's present in this case. And again, in the manufacturing setting, that's going to be present in every case. And so the ruling would have to be that if the manufacturing company shows a temporary employee how to use a machine, that's exercising sufficient control to make them an employer for purposes of Title VII. Whether they want to keep the employee, whether the employee is doing a good enough job to be maintained in that temporary position. So the record is clear, drive didn't have the authority to replace, and that's important in these cases. Correct, but they had the authority to say, I want this person gone. Which is true in every temporary staffing case in the country. Exactly, but in the issue of control, isn't that necessarily an element of control? It's an element, but every one of these cases deals with factors where not all of the elements point in the exact same direction, and there's a weighting of it dependent on the industry about how to apply the factors. Every temporary staffing company in the country can be told by a client that they don't, that the client doesn't want that. Practically speaking, right, because I thought the EEOC made an interesting distinction here. I mean, the EEOC agrees with you, yes, in most cases, the client agency is going to be an employer for all the reasons we're talking about. But there might be exceptions. They have that example of the janitorial employment service hires the janitors, a manager from the service brings them into the building, the client agency. Say they come at night, no one from the client agency is there. I mean, as a practical kind of de facto matter, there's not going to be anyone checking how they're doing their work. There wouldn't be any reason for anyone from the client agency ever to ask to have one of those janitors replaced. So the EEOC is very careful about this, right? They are saying there may be some rare cases where the client agency doesn't have that sort of practical control over termination. But yeah, in most cases, that's the way it's going to fall out. So why is yours the rare case? Yours sounds much more like the typical case. I believe, Judge Harris, you're speaking to example four in the EEOC guidance, and we think we fit squarely within that example. There is on-site supervision by resource at the factory. They can't get in without resource badging them, and resource provides the badges. Right, but the issue, Ms. Lewis, in this case isn't whether resource has some control. They certainly do. The issue is whether drive also shares control with resource. So the fact they do all those things certainly establishes that they are a player in terms of control, but it doesn't establish that they are exclusively the employer, does it? So the point is that resource has control over those things and drive doesn't. So drive did not hire. Drive doesn't let people in. Drive doesn't manage their attendance. Drive doesn't discipline. Drive doesn't manage their performance in any respect. And again, the testimony is undisputed on these points. So the control factors, as they've been applied in temporary staffing cases by the Third Circuit and by district courts in this circuit, all militate in favor of drive not having enough control in this case. Back to your reliance on clackamas, I think that as to the common law of agency, the phrase was, quote, principle guideline. Uh, that implies to me that that's not necessarily the only guidepost. Do you agree with that? The court's quote was that it's the principle guidepost to be followed in deciding whether there's an employment relationship and that it's the common law touchstone of control guided by the factors in Darden. So you're right that it's not the only. It's not the only. But it is the guidepost, the principle, the touchstone. Those are the length. And then the factors elucidate whether the control is present. But it's clear that it's not economic realities or a hybrid test, other than as it relates to the factors that Darden uses from the restatement of agency. Yeah, I mean, economic reality and the hybrid test also focus on control, just through a different method, don't they? So economic realities focuses on interdependence economically of the entities, and that is clearly the wrong inquiry. The factors don't use that type of inquiry. And one other point about that, economic realities comes from the FLSA and FMLA line of cases where the statutory text is different. So FMLA, FLSA have a definition of employer that says that you can be a direct or indirect employer. And that fits more naturally with what you're trying to sort out with multiple employers. So the agency there, the Department of Labor, has issued a regulation on joint employment. In Title VII, ADA, and ADEA, we don't have any language like that. And so the Supreme Court and the Fourth Circuit has filled it in with this control and agency, common law agency theory. I'd like to just give you a chance to address my concern that there's all this case law out there saying that at least in cases of termination, when the client, when the temporary agency terminates a placement, and all the cases use the phrase at the behest of the client. So the client doesn't have the authority to do it itself. They behest, they ask the temporary agency, please replace this person. Then the worker cannot sue the temporary agency because it wasn't the temporary agency's decision. You're telling me, though, that Butler also can't be sued because Butler's not the employment. So does that mean there's a whole class of workers out there who can't sue anybody when they're fired? It doesn't mean that at all. Butler can't sue DRIVE because DRIVE is not her employer, but Resource was her employer. Resource was sued for the termination. Resource settled. I've read the case law, and it looks like at least in many courts, Butler could not bring a case against Resource. Resource would have a defense because Resource would come in and say it wasn't our idea to let her go. That was DRIVE's idea, so go sue DRIVE. I believe those are all district court cases, and they've just employed the wrong analysis. That's not going to be much comfort to the workers who live in those districts. So the federal appellate courts, following Clackamas, should apply the control test, and the staffing agency will certainly be the employer, and if some district court decisions got it wrong and didn't follow the right test, it certainly can be dealt with on appellate review. But the bottom line is that she did sue her employer, Resource, and she settled with Resource. What this actually leads to is double recovery, double dipping, that you can sue multiple entities for the same wrong. And we're dealing with this where courts will say, and you can't get indemnification or contribution against the employer. And I do want to just mention this doctrine of employer and not being the employer by the client has been applied in many cases involving temporary staffing agencies, including the decisions, Judge Duffy's decision cited by Judge Austin, the Kelly staffing cases, one in the Third Circuit, a Third Circuit decision saying that the client was not the employer. And ultimately, like in discrimination law, our clients can't make us make discriminatory choices. The employer is always responsible. The staffing company is always responsible. And Charlie Sanders, in this case, testified that Resource had an independent obligation to look at the termination decision and, in fact, could decide not to end the assignment or not follow the client's instruction. Just as true, that's true in all aspects of discrimination law. The client can't make that decision for you. Unless there are any further questions. All right. Thank you very much. Thank you. Mr. Dunleavy, do you have any rebuttal? Yes, Your Honor. Very briefly, Your Honor, I wanted to come back to a point that I think was made early in my argument. The independent contractor analysis and the joint employer analysis are not the same. And it goes back to what I mentioned earlier, the concept of common control. We agree control is an important factor in this test. But it's common control. It's shared or co-determining the terms and conditions of employment. So it's not a question of either or. Your Honor, counsel mentioned that there might be some risk that there'd be joint employer determinations in every staffing or temporary situation. And we don't believe that's the case. We believe if there was truly an independent work unit supervised on a day-to-day basis by members of the staffing company's management, that that might present a different scenario. And here, what happened was, you had nominally, you had a resource manager on site. That person's in an office drinking coffee. There are drive supervisors, a drive team leader on the floor handling the day-to-day work assignments. And a perfect illustration of this is the incident on December 19th, when there was a dispute about Ms. Butler not wanting to work a particular job, a laser position. And the team leader went to his supervisor, another drive employee. They discussed it. He came back. He said, you work the job I assigned you, or your assignment is over. Nobody went to resource. Nobody went to Mr. Roberson. Resource had absolutely nothing to do with that dispute, nothing to do with any discipline. It was handled entirely by drive supervisors communicating directly with Ms. Butler. Again, there's no question that drive made the decision to end this assignment. There was some discussion about Mr. Sanders, who was a resource witness. And what he said, Mr. Sanders said, he's not aware of any circumstance in which resource interfered with drive's judgment as to ending an assignment or employee discipline. And what Mr. Sanders specifically said was, and I quote, referring to drive, they supervise and manage our employees, we don't. Um, in this case, all of the, all of the evidence suggests that the true control over Ms. Butler's employment was exercised by drive. Thank you. All right, sir. Thank you very much. We'll come down and greet counsel and then proceed directly to the next case.
judges: Barbara Milano Keenan, Henry F. Floyd, Pamela A. Harris